W. M. WEBB, A RESIDENT AND TAXPAYER OF THE TOWN OF MOREHEAD CITY, ON BEHALF OF HIMSELF AND ALL OTHER RESIDENTS AND TAXPAYERS OF THE TOWN OF MOREHEAD CITY, v. THE PORT COMMISSION OF MOREHEAD CITY, A CORPORATION, AND THE MAYOR AND BOARD OF COMMISSIONERS OF THE TOWN OF MOREHEAD CITY.

(Filed 10 January, 1934.)

1. **Statutes A b—Purpose of act determines whether it is special act within meaning of constitutional provision affecting its validity.**

    Whether an act of the Legislature is public or private, general or special within the meaning of a constitutional provision affecting its validity for that reason depends upon its purpose and not its classification by the public official charged with the duty of making such classification. C. S., 7659.

2. **Same—Inhibition on Legislature to pass special act affecting charter of corporation applies only to private or business corporations.**

    Article VIII, sec. 1, prohibiting the Legislature from creating a corporation by special act, applies to private or business corporations and not to public or *quasi*-public corporations having governmental functions as agencies of the State, and whether a corporation is a private or business corporation within the prohibition is to be determined by the purposes for which it was created.

**3. Same—Port Commission of Morehead City held public corporation and Legislative act creating it held valid.**

The Port Commission of Morehead City, created by chap. 75, Private Laws of 1933, is a public corporation created as an agency of the State to perform the governmental function of providing port facilities for the commerce of the State in the public interest, and not for private gain, and the Legislature is not prohibited from creating such corporation by Art. VIII, sec. 1, nor is the act creating it a special act within the meaning of this section of the Constitution, and the Commission may lawfully exercise all powers conferred upon it in order to perform its duties as prescribed by the act.

**4. Taxation A c—Bonds of Port Commission of Morehead City are solely its obligation and not obligation of State or its municipalities.**

The Port Commission of Morehead City, created by chap. 75, Private Laws of 1933, is given authority to construct and maintain port facilities, to charge and collect tolls and fees in. connection with the use of such facilities, its revenues derived from such tolls and fees being lawfully applicable solely to pay expenses of operating, maintaining and constructing such port facilities, and in order to finance the project, to issue its bonds solely on its own credit, which bonds with interest are to be paid from its operating revenues and are not obligations of the State or the town of Morehead City, or any other municipality of this State.

**5. Taxation B d—Bonds and property of Port Commission of Morehead City are exempt from taxation.**

The legislative provision exempting the property and bonds of the Port Commission of Morehead City from taxation is valid since the bonds are to be issued for a public purpose, and certainly the bonds are exempt from taxation if sold to and held by an agency of the United States Government, or are held by a purchaser from such Federal agency. Art. V, sec. 3.

**6. Taxation A f—Provisions as to manner of issuance of bonds of Port Commission in certain contingencies held not to affect their validity.**

The provisions in chap. 75, Private Laws of 1933, that the bonds to be issued by the Port Commission of Morehead City, should be sold under the provisions of the Municipal Finance Act with the approval of the Local Government Commission in the event that the bonds were not sold to a Federal agency, do not affect the validity of the bonds which may be issued and sold to the Federal agency, the provisions being applicable only in certain contingencies and being merely a part of the mechanics for the issuance of the bonds.

**7. Taxation A a—Bonds of Port Commission of Morehead City may be issued without vote.**

Chapter 75, Private Laws of 1933, provides that in the event the operating revenues of the Port Commission of Morehead City should be insufficient to pay its operating and maintenance costs and to pay the interest on its bonds and provide a sinking fund for same, the town of Morehead City might levy a tax with the approval of its qualified voters to make up the deficiency: *Held*, a vote of the qualified electors of Morehead City is not necessary to the validity of the bonds proposed to be issued by the Port Commission, and if the contingency should happen

WEBB *v.* PORT COMMISSION.

and an election called and the tax approved by the qualified electors of the town, such tax would be valid regardless whether it was levied for a necessary expense. Art. VII, sec. 7.

ADAMS and CLARKSON, J.J., concurring.

BROGDEN, J., dissenting.

STACY, C. J., concurs in dissent.

APPEAL by plaintiffs from *Frizzelle, J.,* at Chambers, in the town of Snow Hill, N. C., on 23 September, 1933. From CARTERET. Affirmed.

This is a controversy without action submitted to the Superior Court of Carteret County by the parties thereto, in accordance with the provisions of C. S., 626.

The cause was heard by his Honor, J. Paul Frizzelle, judge holding the courts of the Fifth Judicial District, at his Chambers, in the town of Snow Hill, N. C., on 23 September, 1933, on an agreed statement of facts which is duly verified as required by the statute.

The agreed statements of facts, together with the questions of law in difference between the parties, which arise upon said facts, are substantially as follows:

1. The Port Commission of Morehead City is a corporation created by the General Assembly of North Carolina, by statute duly enacted at its regular Session in 1933. Chapter 75, Private Laws of North Carolina, Session 1933. The members of said commission have been duly appointed, and have duly organized by the election of a chairman, secretary and treasurer, as required by said act. The said commission is now engaged in the performance of its duties as imposed by the act of the General Assembly, and in the exercise of its powers as conferred by said act.

2. Section 2 of said act is as follows: "Sec. 2. The said Port Commission shall have power:

(1) To sue and be sued in the name of the Port Commission; to acquire by purchase and condemnation, and to hold lands for the purpose of constructing, maintaining or operating the terminal or terminals hereinafter referred to; and to make such contracts and to hold such personal property as may be necessary for the exercise of the powers of said Port Commission.

(2) To charge and collect reasonable and adequate wharfage fees and other fees, tolls or dues for the use of such city terminal or terminals, or for the service rendered in the operation thereof.

(3) To develop the port facilities of Morehead City by acquiring by purchase (construction or otherwise), improving, maintaining, and operating a city terminal or terminals for said city, upon the water front of said city, including all necessary wharves, piers, bulkheads,

slips, docks, sheds, warehouses, elevators, and railroad and steamship facilities, and also necessary lands, rights in lands and water rights, to be used and operated for the following purposes, namely: for the landing, loading and unloading of vessels, for the loading and unloading of railroad cars or other carriers, for the interchange or transfer of goods, merchandise or other property between vessels, railroad cars or other carriers, and for the temporary shelter or storage of goods, merchandise or property carried or about to be carried by such vessel, railroad cars or other carriers.

(4) To issue bonds and/or other securities or obligations for the purpose of providing funds for such construction, maintaining and/or operating the said terminal or terminals. Said bonds, if and when so issued, shall be denominated 'Port Commission Bonds of· Morehead City.' and shall be issued in such form and denominations and shall mature at such time or times, not exceeding fifty years after their date, and shall bear such rate of interest, not exceeding six per cent per annum, payable either annually or semiannually, as the said Port Commission may determine. The bonds shall be signed by the chairman of said Port Commission Board, and its corporate seal affixed or impressed upon each bond and attested by the secretary to said board. The coupons to be attached to said bonds shall bear the facsimile signature of the chairman officiating at the time of the issuance of said bonds. Such bonds and/or notes issued for the purpose or purposes above set out may be sold at private sale, for not less than par, to the Reconstruction Finance Corporation or other governmental agency, with the approval of the board of commissioners of Morehead City; but if such private sale is not so made to said Reconstruction Finance Corporation or other governmental agency, then the sale shall be made under the provisions of the Municipal Finance Act of the State and with the approval of the Local Government Commission.

Bonds and notes issued under this act shall be exempt from all State, county or municipal taxes or assessments, direct or indirect, general or special, and the interest paid on said bonds or notes shall not be subject to taxation as income, nor shall said bonds or notes, or coupons on said bonds, be subject to taxation when constituting part of the surplus of any bank, trust company or other corporation.

(5) Any resolution or resolutions authorizing any bonds may contain provisions which shall be part of the contract with the holders of the bonds, as to:

(a) Pledging the wharfage fees and other fees, tolls, dues or other revenues to secure the payment of the bonds;

(b) The rates of the tolls to be charged for the use of the facilities of the terminal or terminals, and the use and disposition of the tolls and other revenues;

(c) The setting aside of reserves or sinking funds and the regulation and disposition thereof;

(d) Limitation on the purposes to which the proceeds of sale of any issue of bonds to be issued may be applied;

(e) Limitation on the issuance of additional bonds;

(f) The procedure, if any, by which the terms of any contract with bondholders may be amended or abrogated, the amount of bonds the holders of which must consent thereto, and the manner in which such consent may be given.

(g) To do all things necessary or convenient to carry out the powers expressly given in this act."

3. The Port Commission of Morehead City has filed with the Public Works Administration, at Washington, D. C., an application for a loan with which to provide funds for acquiring, constructing, maintaining, and/or operating terminal and terminal facilities at Morehead City, and is proposing to issue bonds and/or other securities or obligations for the purpose of procuring said loan. The bonds when so issued are to be denominated "Port Commission Bonds of Morehead City," and are to be issued in such form and denominations, and will mature at such time or times, not exceeding fifty years from their date, and will bear interest at such rate, not exceeding six per cent per annum, as the said Port Commission may determine, with the approval of the Public Works Administration, and not inconsistent with chapter 75, Private Laws of North Carolina, Session 1933. The bonds are to be signed by the chairman of said Port Commission, and shall have affixed thereto or. impressed thereon the corporate seal of said commission, attested by its secretary. The coupons to be attached to said bonds will bear the facsimile signature of the chairman of said commission, officiating at the time of the issuance of said bonds. It is proposed that the said commission shall sell said bonds at private sale, for not less than par, to the Public Works Administration or other governmental agency; and that if such sale be not made to such governmental agency, then the sale shall be made under the provisions of the Municipal Finance Act of the State of North Carolina, with the approval of the Local Government Commission of said State.

4. Section 6 of said act is as follows: "Sec. 6. All wharfage fees and other fees, tolls, dues or other revenues derived by the Port Commission from the operation of such terminal or terminals shall be applied to the payment of the cost of operation and administration of said terminal or terminals (including interest on bonds or other evidences of indebtedness issued therefor, and the cost of insurance against loss by injury to persons or property) and the balance to be paid to the treasurer and to be used for the purpose of providing a sinking fund with

which to pay at or before maturity all bonds and/or notes or other evidences of indebtedness incurred for or on behalf of the building, constructing, maintaining and operating said terminal."

5. Section 7 of said act is as follows: "Sec. 7. Whenever the said Port Commission shall determine that such wharfage fees, and other fees, tolls, dues and other revenues will be or are insufficient to pay in any year the cost of operation and administration of said terminal or terminal facilities (including interest on bonds or other evidences of indebtedness issued therefor, and the cost of insurance against loss by injury to persons or property) and sinking fund requirements for such year, it shall certify to the board of commissioners of Morehead City the amount of such anticipated or existing deficiency, and upon receipt of such certificate it shall be the duty of said board of commissioners of Morehead City to cause to be levied on all the taxable property within the territorial limits of said city in the same manner as other city taxes are levied, a special tax in an amount sufficient to meet such deficiency, not exceeding, however, an amount equivalent to ten cents on each one hundred dollars of taxable values for the year or years in which such levy is sought and/or required to be made, and the tax so levied shall be in addition to all other taxes authorized by law to be levied in said municipality; and the authorization for such levy and the levy of such taxes for said special purposes are hereby declared to be levies for necessary purposes, notwithstanding any prohibition in any general or special acts now existing. Any indebtedness incurred by said Port Commission pursuant to this act shall not be taken into consideration in determining the power of the city of Morehead to become further indebted; Provided, however, that the board of commissioners of Morehead City shall not make or cause to be made such tax levy as above provided for until there first shall have been submitted to the qualified voters of said municipality the question of special tax levy for the indicated purpose and a majority of the qualified voters shall have voted in favor of such special levy."

6. The bonds which the Port Commission of Morehead City proposes to issue and sell in order to procure funds to enable said commission to perform the duties imposed upon said commission by the act of the General Assembly, will not be issued in the name of the town of Morehead City, or in the name of the State of North Carolina. Neither the State nor said municipality will be obligated for the payment of said bonds, or of interest on the same. No tax will, or can be levied upon the taxable property within the territorial limits of the town of Morehead City, until such tax has been approved by a majority of the qualified voters of said town at an election to be called by its board of commissioners, in accordance with the provisions and subject to the

limitations of the act of the General Assembly creating the Port Commission of Morehead City.

7. Section 11 of the act is as follows: "Sec. 11. It is hereby declared to be the policy of the State of North Carolina to promote, encourage, and develop water transportation, service, and facilities in connection with the commerce of the United States, and to foster and preserve in full vigor both rail and water transportation, and that Morehead City, North Carolina, is hereby declared to be a port to be developed in connection with the interior of the State of North Carolina and other states, and it is hereby declared and deemed by the State of North Carolina, necessary and desirable, and in the public interest of the entire State that there shall be established through Morehead City, through connecting water and rail rates in connection with shipping companies, and other transportation companies and in accordance with the provisions of the acts of Congress of the United States, and the laws of North Carolina. The said Port Commission shall be regarded as performing an essential governmental function in undertaking the construction, maintenance and operation of the said terminal or terminals, and in carrying out the provisions of this act in relation thereto, and shall be required to pay no taxes or assessment upon any of the properties acquired or used by it for such purposes."

8. Chapter 75, Private Laws of North Carolina, Session 1933, was ratified on 22 March, 1933. It has been in full force and effect since the date of its ratification.

The questions of law which arise on the foregoing facts, involve:

"1. The constitutionality of chapter 75, Private Laws of North Carolina, Session 1933.

2. The validity of the bonds which the Port Commission of Morehead City propose to issue under the authority of said act.

3. The issuing authority of said bonds, whether the Port Commission of Morehead City or the town of Morehead City.

4. Whether the bonds are for 'necessary expenses' within section 7, Article VII of the Constitution of North Carolina.

5. Whether an election, to be called and held in the town of Morehead City, at which the majority of the qualified voters of said town shall approve the issuance of said bonds, is required as a condition precedent to the issuance of said bonds.

6. Whether the bonds if issued and sold by the Port Commission of Morehead City will be subject to any debt limit other than as specified in the act.

7. The term and maturities of said bonds as related to the period of usefulness of the project.

8. The authority of the Port Commission of Morehead City to charge fees and tolls for the services rendered by the project, to pledge the revenues thereof, and to limit the issuance of additional bonds.

9. The application of the Local Government Act of North Carolina to the issuance of said bonds and the functioning of the said Port Commission.

10. The application of the Municipal Finance Act to the issuance of said bonds.

11. The constitutionality of the provisions of said act exempting the property and bonds of the Port Commission from any and all taxation."

Upon consideration of the foregoing facts, the court determined the questions of law arising thereon, and ordered and adjudged as follows:

(a) That chapter 75, Private Laws of North Carolina, Session 1933, is in all respects constitutional and a valid enactment.

(b) That the bonds issued and/or to be issued in conformity with the provisions of said act of the General Assembly of North Carolina are/or will be valid obligations of the Port Commission of Morehead City.

(c) That the issuing authority under the aforesaid act of the General Assembly of North Carolina is the Port Commission of Morehead City.

(d) That the bonds of said Port Commission of Morehead City provided for in said act as, if and when issued constitute valid obligations for necessary expenses within the expressed terms of the act creating said Port Commission, and by reason of the legislative declaration as to the location and condition of the property affected with the governmental functions imposed upon the said Port Commission form a necessary expense within a proper construction of Article VII, section 7, of the Constitution of North Carolina.

(e) That no election is necessary or required as a condition precedent to the issuance of the said bonds proposed to be issued by the said Port Commission of Morehead City.

(f) That said bonds are subject to no debt limitation other than as specified in the act authorizing the issuance of the same.

(g) That the term and maturities of the bonds proposed to be issued by said Port Commission are shorter in term of duration than the life of the utility of the project, as said maturities are limited to twenty-five years and the period of usefulness of the project by the issuance of said bonds is assured an increasing usefulness limited only to the life of the community in which the project is intended to function.

(h) That the act of the General Assembly of North Carolina creating the Port Commission of Morehead City, constitutional in all its provisions, bestows ample authority on said Port Commission to charge fees and tolls for services rendered, to pledge the revenues derived from said project, and to limit the issuance of additional bonds.

WEBB *v.* PORT COMMISSION.

(i) That the provisions of the Local Government Act are not applicable in any respect unless it is proposed that the said bonds of the Port Commission of Morehead City shall be sold to others than the Reconstruction Finance Corporation, Public Works Administration, or other governmental agency, in which case the sale shall be made with the approval of the Local Government Commission of North Carolina.

(j) That the Municipal Finance Act of North Carolina has no application to the issuance of bonds by the Port Commission of Morehead City or to the incurring of any other form of obligation by the said Port Commission, nor to the sale of such bonds unless said bonds are sold to some person other than the Reconstruction Finance Corporation, Public Works Administration or other governmental agency.

(k) That the exemption of the property of said Port Commission of Morehead City and of its bonds from taxation, is constitutional and said exemption is expressly provided in the act of the General Assembly of North Carolina, creating said commission, which expressly provides that the said Port Commission 'shall be regarded as performing an essential governmental function in undertaking the construction, maintenance, and operation of the said terminal or terminals . . . and shall be required to pay no taxes or assessment upon any of the properties acquired or used by it for such purposes' and 'that bonds and notes issued under this act shall be exempt from all taxes.' "

The plaintiffs excepted to the foregoing judgment and to every part thereof, and appealed to the Supreme Court.

*Alvah L. Hamilton and Julius F. Duncan for plaintiffs.*
*Luther Hamilton, W. H. Hoyt and L. R. Varser for defendants.*

CONNOR, J. It is contended on behalf of the plaintiffs, on their appeal to this Court, that chapter 75, Private Laws of North Carolina, Session 1933, is unconstitutional and void, because by its enactment the General Assembly has undertaken to create a corporation by a special act in violation of the prohibition of section 1 of Article VIII of the Constitution of North Carolina. If this contention is sustained, the judgment of the Superior Court is erroneous in all respects, and must be reversed. If, however, the act is constitutional and valid, the Port Commission of Morehead City is a corporation duly created and organized under the laws of this State, with such powers as are conferred upon said corporation by the General Assembly in the exercise of its valid legislative power. In that case, the validity of these powers as set out in the act, is presented by the plaintiffs' exception to the judgment, and must be determined by this Court in disposing of this appeal. If some of these powers are valid, and others invalid, because of constitutional prohibi-

tions, the judgment must be modified and affirmed. If all the essential powers conferred by the act on the Port Commission of Morehead City, as a corporation, are valid, the judgment must be affirmed. Thus the primary question involved in this appeal is whether the act of the General Assembly creating the corporation is unconstitutional and void, as contended on behalf of the plaintiffs.

Section 1 of Article VIII of the Constitution of North Carolina, is as follows:

"Section 1. Corporations under General Laws. No corporation shall be created, nor shall its charter be extended, altered, or amended by special act, except corporations for charitable, educational, penal or reformatory purposes that are to be and remain under the patronage and control of the State; but the General Assembly shall provide by general laws for the chartering and organization of all corporations and for amending, extending and forfeiture of all charters, except those above permitted by special act. All such general laws and special acts may be altered from time to time or repealed; and the General Assembly may at any time by special act repeal the charter of any corporation."

Whether or not chapter 75, Private Laws of North Carolina, Session 1933, is a special act within the meaning of section 1 of Article VIII of the Constitution, is to be determined not by its form or by its publication as a private act, but by its purpose as disclosed by its language, and by what in the ordinary course of things must necessarily be its operation and effect. *R. R. v. Cherokee County,* 177 N. C., 86, 97 S. E., 758; *Hancock v. R. R.,* 124 N. C., 222, 32 S. E., 679. Whether a statute is public or private, general or special, within the meaning of a constitutional provision affecting its validity for that reason, depends upon its purpose as shown by its contents, and not upon the judgment of a public official, who has directed its publication in the performance of an administrative duty imposed upon him by statute. C. S., 7659.

And so, whether or not the corporation created by chapter 75, Private Laws of North Carolina, Session 1933, and known as the Port Commission of Morehead City, is such a corporation as the General Assembly is prohibited from creating by section 1 of Article VIII of the Constitution, is to be determined by the purposes for which said corporation was created, and the powers which are conferred upon said corporation by the act, and not by a strict and literal construction of the word as used in said section. It has been uniformly held by this Court since section 1 of Article VIII was ratified as an amendment to the Constitution, that the prohibition contained in the section refers to private or business corporations, and not to public or *quasi*-public corporations created by the General Assembly, as governmental agencies with power to perform governmental functions. *Holmes v. Fayetteville,*

197 N. C., 740, 150 S. E., 624. In that case it is said: "It has been held that this section applies only to private or business corporations and not to those of a public or *quasi*-public nature, such as cities, towns, and counties. *Kornegay v. Goldsboro,* 180 N. C., 441, 105 S. E., 187. A municipality furnishing water or light renders service for a public purpose, and the fact that the water or service is furnished for individual consumption or the use of the inhabitants does not detract from the public service. Private purposes may be served incidentally, but this does not destroy the public character of the corporation or municipality. 3 Dillon (5 ed.), sec. 1300." The suggestion to this effect was first made in *Board of Education v. Comrs.,* 174 N. C., 47, 93 S. E., 383, and was subsequently approved in *Mills v. Comrs.,* 175 N. C., 215, 93 S. E., 481. It may be that in neither of these cases was the question directly presented. The question was, however, directly presented and decided by this Court in *Kornegay v. Goldsboro,* 180 N. C., 441, 105 S. E., 187, and in *Dickson v. Brewer,* 180 N. C., 403, 104 S. E., 887. In *Kornegay v. Goldsboro, supra,* it was held that section 1 of Article VIII of the Constitution must be construed in connection with sections 2 and 3 of said article. Applying this principle, it was held that the word "corporation," used in section 1 of Article VIII, must be construed as meaning a corporation created for private or business purposes.

An examination of all the provisions of chapter 75, Private Laws of North Carolina, Session 1933, discloses that the corporation created by said act, to be known as the Port Commission of Morehead City, is not a private or business corporation, but is a public corporation, created by the General Assembly as an agency of the State to perform a well recognized governmental function, to wit: to provide facilities for the transportation of goods, wares and merchandise both into and out of the State by means of carriers over land and water. These facilities will not be constructed, maintained or operated, under the terms of the act, for private gain, but solely in the public interest. Revenues derived from the operation of the facilities will be devoted exclusively to the payment of the expense of their operation and maintenance, and of the interest on the bonds, and of the bonds, at their maturity, which the corporation is authorized to issue to procure funds to defray the expense of constructing, maintaining and operating the said facilities. For these reasons, the statute is not a special act within the meaning of section 1 of Article VIII of the Constitution of this State, nor is the Port Commission of Morehead City such a corporation as the General Assembly of this State is prohibited from creating by said section.

The contention that chapter 75, Private Laws of North Carolina, Session 1933, is unconstitutional and void, because its enactment was

22—205

in violation of section 1 of Article VIII of the Constitution of North Carolina, is not sustained. There was no error in the judgment of the Superior Court that said act is constitutional and valid. Its enactment was not in violation of any prohibition of the Constitution of this State.

The Port Commission of Morehead City is a corporation duly created by the General Assembly of this State, in the valid exercise of its legislative power. As such corporation, the said commission has the power to construct, maintain and operate the facilities described in the act, and to charge, and collect fees and tolls from those who avail themselves of the service provided by the said facilities. The revenues derived from the operation of said facilities must be applied solely and exclusively to the payment of the expenses incurred by the commission in operating, maintaining and constructing the said facilities. No part of said revenues can be lawfully applied or appropriated to any other purpose. Under the terms of the act, none of said revenues will be paid to the State of North Carolina, to the town of Morehead City, or to any municipality of the State of North Carolina, unless, of course, the State or some of its municipalities shall become holders of the bonds, which may be issued by the said Port Commission.

The Port Commission of Morehead City, as a corporation duly created and organized under the laws of this State, has the power, expressly conferred upon the corporation, to issue and sell its bonds for the purpose of procuring funds with which to pay for the construction, maintenance and operation of the facilities which the said commission is authorized to construct, maintain and operate at Morehead City. These bonds will not be obligations of the State of North Carolina, of the town of Morehead City, or of any other municipality of this State.

The credit of neither the State, nor of the town of Morehead City, nor of any other municipality of this State, is pledged for the payment of said bonds, or of the interest on the said bonds. The bonds may be issued only on the credit of the Port Commission of Morehead City, as a corporation. The interest on the bonds, and the bonds, as they shall mature, will be paid only out of revenues derived from the operation of the facilities which the Port Commission is authorized to construct, maintain and operate at Morehead City. The provision in the act by which the Port Commission was created that its property and the bonds that may be issued and sold as authorized by the act shall be exempt from taxation by the State, or any of its political subdivisions, is valid. The General Assembly has the power to so provide, for the reason that the property of the Port Commission will be held, and the bonds will be issued solely for public purposes. Whatever doubt

there may be as to the validity of this provision, by reason of section 3 of Article V of the Constitution of this State, must be, under well settled principles of constitutional construction, resolved in favor of its validity. Certainly, if the bonds are sold to an agency of the United States Government, as contemplated by the act, the provision is valid so long as the bonds are held by such agency, or by any person, firm or corporation holding the same by purchase from such agency. The provisions of the act, with reference to the board of commissioners of the town of Morehead City, the Municipal Finance Act of North Carolina, or the Local Government Commission of this State, do not affect the validity of bonds which may be issued and sold by the Port Commission to an agency of the United States Government. These provisions, applicable only in certain contingencies, are merely a part of the mechanics provided for the issuance of the bonds.

The provisions of the act by which the Port Commission of Morehead City was created, relative to the calling and holding of an election in the town of Morehead City, to determine whether a majority of the qualified voters of said town approve the levying of a tax by the board of commissioners of said town for the purpose of raising money to aid the said Port Commission in the performance of its duties, do not affect the validity of the bonds which the Port Commission may issue under the power conferred upon the said commission by the act. Such an election is not a condition precedent to the issuance of the bonds. The election may be called and held only in the contingency provided for by the act. If such contingency shall happen, and the election shall be called and held, and a majority of the qualified voters of the town shall approve the levying of the tax, as authorized by the act, the tax will be valid, and may be lawfully levied and collected, without regard to whether the tax is for a necessary purpose within the meaning of section 7 of Article VII of the Constitution of North Carolina. Such tax will be for a public purpose. *Briggs v. Raleigh,* 195 N. C., 223, 141 S. E., 597.

Some of the specific questions in difference between the parties to the controversy and submitted to the court for determination are not necessarily involved in the larger questions presented. There is no error in the judgment to the effect:

(1) That chapter 75, Private Laws of North Carolina, Session 1933, is in all respects a valid and constitutional enactment;

(2) That the Port Commission of Morehead City is a corporation, duly created and duly organized under the provisions of the act;

(3) That the Port Commission of Morehead City, as a corporation created by the General Assembly, for a public purpose, may lawfully

exercise all the powers conferred upon the said commission by the General Assembly in order that said commission may perform its duties as prescribed by the act;

(4) That the bonds which the Port Commission of Morehead City proposes to issue and sell, under the authority conferred upon said commission by the act, will be valid obligations of said commission, and if sold to an agency of the United States Government, will be exempt from taxation, so long as held by such agency, or by any person, firm or corporation holding the same as a purchaser or purchaser from such agency.

(5) That if an election shall be called and held by the board of commissioners of the town of Morehead City, and the levying of a tax as authorized by the act shall be approved by a majority of the qualified voters of said town at said election, such tax will be valid, and may be lawfully levied and collected.

In arriving at the conclusion that the judgment of the Superior Court should be affirmed, we have not been unmindful of contentions made by the counsel for the appellants in their arguments in this Court to the contrary, nor have we been indifferent to well settled principles of constitutional construction. The arguments were forceful and persuasive, but we think not conclusive. The construction of the act has not been, we think, in violation of these principles. It is true that we have not been aided by decided cases or precedents. The questions presented are novel, and in many respects of first impression. We have been influenced largely in our conclusion by the language used by the General Assembly in section 11 of the act. It is there declared that "the Port Commission shall be regarded as performing an essential governmental function in undertaking the construction, maintenance and operation of the said terminal or terminals, and in carrying out the provisions of this act in relation thereto, and shall be required to pay no taxes or assessment upon any of the properties acquired or used by it for such purposes." It is further declared in said section that it is "the policy of the State of North Carolina to promote, encourage and develop water transportation, service and facilities in connection with the commerce of the United States and to foster and preserve in full vigor both rail and water transportation, and that Morehead City, North Carolina, is hereby declared to be a port to be developed in connection with the interior of the State of North Carolina."

Chapter 75, Private Laws of North Carolina, Session 1933, was enacted in furtherance of the declared policy of the State, and in all its provisions is reasonably adequate to that end. The judgment is

Affirmed.

ADAMS, J., concurring: By a process of reasoning divergent in some particulars from that which is indicated in the principal opinion as written by *Justice Connor,* I am convinced that the legislative act creating the Port Commission of Morehead City (Private Laws, 1933, chap. 75), intended as it was to promote and preserve the interests of the State, is not within the inhibitive clause of Article VIII, section 1, of the Constitution, and that the result announced in the opinion of the Court is correct. I therefore concur in the result therein stated.

CLARKSON, J., concurring: I concur in the opinion of *Mr. Justice Connor.*

A unanimous Court made the following order: "This cause is set down for oral argument on Wednesday, 15 November, 1933, at ten o'clock, counsel are directed to discuss the applicability of Article VIII, section 1, of the Constitution of North Carolina."

So, it may be conceded that the only serious question involved on this appeal is whether or not chapter 75, Private Laws of 1933, is constitutional.

Article VIII, section 1, is as follows: "No corporation shall be created nor shall its charter be extended, altered, or amended by special act, except corporations for charitable, educational, penal, or reformatory purposes that are to be and remain under the patronage and control of the State; but the General Assembly shall provide by general laws for the chartering and organization of all corporations and for amending, extending, and forfeiture of all charters, except those above permitted by special act. All such general laws and special acts may be altered from time to time or repealed, and the General Assembly may at any time by special act repeal the charter of any corporation."

Judge Frizzelle, in the court below held the act constitutional.

In *Sutton v. Phillips,* 116 N. C., at p. 504, speaking to the question of declaring an act unconstitutional, this Court said: "While the courts have the power, and it is their duty, in proper cases to declare an act of the Legislature unconstitutional it is a well recognized principle that the courts will not declare that this coördinate branch of the government has exceeded the powers vested in it unless it is plainly and clearly the case. *If there is any reasonable doubt it will be resolved in favor of the lawful exercise of their powers by the representatives of the people.* (Italics ours.)  . . .  (p. 505) It cannot be said that this act is plainly and clearly unconstitutional. The doubt, if any, must be resolved in favor of the General Assembly." *Hinton v. State Treasurer,* 193 N. C., 496 (499).

It has often been decided by this Court that the purpose and spirit of an act must be considered in its construction and its obvious intent

ascertained and respected. *Guano Co. v. Walston,* 187 N. C., 667. Spirit and reason of statute should prevail over its letter. *Carr v. Little,* 188 N. C., 100.

The spirit and reason of the statute, I think, creates the Morehead City Port Commission—an agency of the State—and does not come within the inhibitions of Art. VIII, sec. 1, and is not a private or business corporation, and is therefore constitutional. The distinction between *public* and *private* corporations is clearly stated in a text-book, unexcelled. 1 Thompson on Corp., 3d ed., sec. 24 (p. 29-30), in part is as follows: "Another general division of lay corporations is into public and private. This distinction is practical, but not always clear. While it is not within the scope of this work, as observed, to treat of public corporations, yet it is important to show the dividing line between public and private corporations. The importance of the distinction between the two is emphasized by the fact that many principles and rules which apply to one have no application to the other. (1) Thus a public corporation is subject to legislative control without any reference to the consent of the persons who control it. (2) A public corporation does not originate in contract, while a private corporation does, and therefore the instrument creating the latter cannot be altered or amended by the law-making power, without the consent of the members who compose it, unless such power is expressly reserved. Public corporations are mere creatures or instrumentalities of the State and are subject to governmental visitation and control. So, the property of a public corporation is not taxable, while that of a private corporation is. (3) A public corporation is, generally, political in its nature, and its object is to carry out a scheme of government, while a private corporation has none of these characteristics. Public corporations, as a rule, are not liable either for the negligence or torts of their officers. Perhaps the only exception to this rule is in the case of counties, cities and towns, and then only in a limited sense, and in regard to matters involving the exercise of ministerial acts and not governmental functions. The right to create these corporations is vested exclusively in the legislature, subject only to constitutional limitations."

The above distinction between public and private corporations is supported by numerous authorities and by the decisions of this State.

It is a matter of common knowledge that in the summer of 1916 a great freshet swept away the railroad bridges in the western part of the State. The amendments to the Const., Art. II, sec. 29, and Art. VIII, sec. 1, *supra,* went into effect 10 January, 1917. In *Mills v. Comrs.,* 175 N. C., 215 (216), it is said by *Hoke, J.:* "On full presentation of facts, the controversy submitted was whether plaintiffs, citizen residents and taxpayers of said county, were entitled to an injunction

against defendant board, restraining them from the proposed issuance and sale of bonds of the county to the amount of $40,000, pursuant to chapter 575, Public-Local Laws of the General Assembly of 1917, ratified 5 March, 1917, for the purpose of rebuilding bridges over the Catawba River between Iredell and Catawba counties in conjunction with the authorities of the latter county, the determinative question being whether said act was in violation of the recent constitutional amendments prohibiting certain local and special and private legislation on the subject, contained chiefly in the Constitution, Art. II, sec. 29, etc. . . . (p. 217.) Shortly after these amendments were ratified, a case was presented involving the question whether, in view of these provisions 'An act authorizing the commissioners of McDowell County to issue bonds for road purposes in North Cove Township, in said county,' was a valid law. *Brown v. Comrs.,* 173 N. C., 598. The statute was upheld, and it was decided, *Associate Justice Brown* delivering the opinion, that there was nothing in these amendments which prohibited the Legislature from authorizing county commissioners or other governmental boards to raise money by the issue of bonds or by current taxation to enable them to carry out the necessary measures for the orderly and proper government of their counties, or even more restricted territory. . . . (p. 218-19.) *An interpretation of the recent amendments which would destroy or impair legislative power to the extent suggested would be of such serious and threatening consequence that it should not be sanctioned except by provisions so plain of meaning that no room for a different construction is allowable.* We are clearly of opinion that this well considered case of *Brown v. Comrs., supra,* is fully supported by the authorities cited and is decisive of the questions presented on this record. It is suggested that the legislation in question *is in some way in contravention of Article VIII, sections 1 and 4, of the Constitution,* the latter section being also one of the recent amendments referred to, but we do not see how either of these sections is in any way involved in the present appeal. *While it is not desirable nor ordinarily permissible to decide questions of this nature otherwise than on an issue directly presented (Commissioners v. Lacy,* 174 N. C., 141), *it may not be improper to suggest that this Article VIII is entitled 'Corporations other than municipal,' and section 1 would seem clearly to have reference to private or business corporations, and does not refer to public or quasi-public corporations acting as governmental agencies."* (Italics mine.) This *obiter dictum* has been approved in several decisions since rendered.

In *Martin County v. Trust Co.,* 178 N. C., 26 (27), it is said: "This is a controversy submitted without action upon facts agreed, and involves the validity of $150,000 bonds proposed to be issued by the county

of Martin under authority of Public-Local Laws, 1919, chap. 53, entitled 'An act to authorize the boards of commissioners of Martin and Bertie counties to build a bridge over the Roanoke River at Williamston, N. C., and for other purposes.' "

In sustaining this bond issue and approving the *Brown* and *Mills* cases, *Clark, C. J.,* said: "The rule to be deduced from these authorities may be thus summed up: The construction and maintenance of roads and bridges is a matter of general public concern. The whole body of the people of this State is benefited by them. *The Legislature may cast the expense of such public works upon the State at large, or upon territory specially and immediately benefited, even though the work may not be within a part of the total area attached."* (Italics mine.)

In *Dickson v. Brewer,* 180 N. C., at p. 406, *Allen, J.,* says: "School districts, incorporated by act of the General Assembly, are public municipal corporations, and as such come under the provisions of Article VII of the Constitution, entitled 'Municipal corporations.' (See *Smith v. School Trustees,* 141 N. C., 150, where the question is fully discussed. Also *Williams v. Comrs.,* 176 N. C., 557), and not under Article VIII, which is entitled 'Corporations other than municipal,' and section 1 would seem clearly *to have reference to private business or business corporations, and does not refer to public or quasi-public corporations acting as governmental agencies. Mills v. Comrs.,* 175 N. C., 218." (Italics mine.)

In *Comrs. v. Bank,* 181 N. C., 347 (350-1), *Clark, C. J.,* says: "This Court has repeatedly upheld acts incorporating boards of road commissioners, vesting in them the power to issue bonds and giving them full control over the construction, maintenance, laying out, altering and discontinuing of roads and highways. *Comrs. v. Comrs.,* 165 N. C., 632, citing numerous cases, saying, 'The Legislature has the authority to create a board of road commissioners and vest them with the authority over the roads that the county commissioners had theretofore possessed, quoting *Trustees v. Webb,* 155 N. C., 383, to the same effect and saying that 'the jurisdiction of the road commissioners to these matters *is subject to regulation, in the discretion of the Legislature.'* " (Italics mine.)

In *Honeycutt v. Comrs.,* 182 N. C., 319 (320-21), *Stacy, J.,* says: "The act under consideration, among other things, provides as follows: 'Sec. 3. The road commissioners herein created shall have entire control and management of the public roads and bridges of Stanly County. That it shall be the duty of said board to take charge of working, repairing, maintaining, altering and constructing all roads and bridges of Stanly County now maintained by the county as public roads and bridges and such as may be hereafter built.' Thus it will be seen that

the purpose of the act in question was not to authorize the laying out, opening, altering, or discontinuing of any given road or highway, but to provide ways and means by which the general road work of the entire county might be successfully carried on and maintained. The two highway commissions hitherto existing in the county were to be abolished and one new central system established. It has been held with us in a number of cases that acts of this character do not fall within the constitutional prohibition against local or private legislation. *Brown v. Comrs.,* 173 N. C., 598, and cases there cited; *Mills v. Comrs.,* 175 N. C., 215; *Martin County v. Trust Co.,* 178 N. C., 27; *Comrs. v. Pruden,* 178 N. C., 394; *Comrs. v. Bank,* 181 N. C., 347, and cases there cited." But for the old Court, through *Justice Brown* writing the majority opinion for the Court in the *Brown case, supra,* giving a liberal interpretation to the Constitutional Amendments, the highway system of the State would have been in quick-sand and perhaps the State Highway System would have never been as now spoken of as the greatest in the nation.

These matters were again passed on by *Adams, J.,* in *Coble v. Comrs.,* 184 N. C., 342 (348-9), where it is said: "We should apply the principle that every presumption is to be indulged in favor of the validity of the statute, that the General Assembly is presumed to have acted with an honest purpose to observe the restrictions and limitations imposed by law, and that legislation will be sustained unless its invalidity is 'clear, complete and unmistakable,' or unless the nullity of the act is beyond a reasonable doubt," citing numerous authorities. *Comrs. v. Pruden,* 178 N. C., 394; *S. v. Kelly,* 186 N. C., 365; *Reed v. Engineering Co.,* 188 N. C., 39.

In *Yarborough v. Park Commission,* 196 N. C., 284, there was a unanimous decision by this Court, *Adams, J.,* writing the opinion for the Court (p. 288), "The defendant is an agency of the State." (p. 291) "The act is public, not private. A public statute is a universal rule which regards the whole community as distinguished from one which operates only upon particular persons and private concerns. It is usually applicable to all parts of the State, *but the statute will not be deemed private merely because it extends to particular localities or classes of persons.* 25 R. C. L., 763; *S. v. Chambers,* 93 N. C., 600." (Italics mine.)

The Great Smoky Mountain National Park Act, where individual and corporation property was taken "for pleasure and sentiment," was held constitutional as a public purpose in a locality in the northwestern part of the State, *Yarborough case, supra* (p. 290): "The fund, $2,000,000, is vastly inadequate to pay for the lands, which are within

the scope and contemplation of the act," and with the knowledge that it was to be turned over to the U. S. Government.

This Park Act was held to be an agency of the State and a public purpose, although the park is in the northwestern corner of the State—some 500 miles from Morehead City. Its purpose is for pleasure, but indirectly to create for that section of the State a "tourist industry." The present act is to construct, maintain and operate terminal or terminals which will open up a section of eastern North Carolina, to cheapen freight rates and encourage water commerce in that part of the State.

It has been the dream of a multitude of North Carolinians and they have had a vision for long years to open up for commerce the great water fronts of eastern North Carolina, so that cotton, tobacco and other agricultural products and the products of the textile, furniture and other industries in North Carolina should go to other parts of the nation and to foreign countries through these ports and thus obtain cheaper freight rates and bring back necessary products of other states and of foreign lands. Railroad facilities and hard-surfaced highways to these eastern North Carolina ports are ready for water facilities.

When the present act was passed, what was the purpose and spirit? In construing the act let us get the setting: Morehead City has a population of about 5,000 inhabitants and is on Bogue Sound. It is connected with Beaufort, a city of about 4,500 population, by a $1,000,000 highway bridge across Bogue Sound. From Morehead City to the Atlantic Ocean bar is about 3 miles, with a harbor of 25 to 35 feet of water. The great inland waterway, constructed by the National Government, is 12 feet deep and extends from Boston, Mass., to New York, Philadelphia, Baltimore, Washington, Norfolk, *Morehead City,* Wilmington, Charleston, Brunswick, Jacksonville (contemplated across Florida by a canal) then to Pensacola, Mobile, New Orleans, etc. It has been the south's dream for 100 years and is being built and surveyed. The Inland Waterway has been completed through North Carolina and is now being carried on down through South Carolina, and the survey is now being completed further south. The canal, it is contemplated, will cross the northern portion of Florida and would cut 21 hours off a boat trip from New York to New Orleans. Morehead City is the terminus of the Atlantic and N. C. R. R. (owned by the State) now leased to the Norfolk and Southern R. R., and runs back into the State. No. 10, the "Main Street" of North Carolina, a hard-surfaced road, runs from Morehead City to Murphy, in Cherokee County—some 500 miles. About 1,500 yachts pass through the inland waterway at Morehead City each year. Across Bogue Sound is Atlantic Beach, one of the finest on the eastern coast of North Carolina. Fishing smacks from New England

and elsewhere during the winter months come down through the canal and drag their nets in the Atlantic Ocean and it is estimated that 75 per cent of all fish that go to northern markets are caught from the Atlantic off the eastern shores of North Carolina. The potential value of the oyster and fish industry along the eastern shore is unlimited. Morehead City is well adapted for a distributing port for water-borne commerce, except that it has no adequate port or terminal facilities, such as are demanded by the shipping interests, and such as are in keeping with other ports on the South Atlantic seaboard. Not being an industrial center, the city of Morehead depends, in a large measure, for its material and commercial welfare, upon its development as a port. This development is retarded by its present failure to offer adequate port and terminal facilities. Under present conditions, it cannot successfully compete with other South Atlantic ports which have publicly owned facilities of the nature contemplated. Millions upon millions of dollars have been spent on State and municipal terminals. I mention only a few: Norfolk, Va., Charleston, S. C., Mobile, Ala., New Orleans, La., Houston, Texas, San Diego, Los Angeles and San Francisco, Cal., Portland, Ore., Tacoma and Seattle, Wash., Boston, Mass., Providence, R. I., etc. States and cities everywhere are constructing public ports and facilities for shipping. One port—that of Portland, Ore.—has been built 113 miles from the sea; and Los Angeles, Cal., has gone 25 or 30 miles to the sea and built a port, and the port of Houston, Texas, is built 50 miles from the gulf at an expense of more than thirty millions of dollars. To have our ports and waterways improved, the U. S. Government requires public terminals.

The U. S. law on the subject: "Every United Port should own its water front, and this should be controlled by a port authority composed of the business men who have an excellent grasp of the export and import business and who are willing to devote sufficient time to the subject. These should be appointed without regard to political affiliations, and should take the broad view that the port is the property of the people at large, and that the provision of the best facilities will promote quicker ship dispatch, attract more ships, and thus enlarge the commerce of the port; that while the port terminal should be self-supporting, the charges should be adjusted to produce this result; without injury to business and that the growth of the port will mean the growth of the city and increased material prosperity to the individuals of the city and State. Those states which have only one-man ports should in particular exert themselves to develop it along the most modern lines, and the first step in this direction is the appointment of a competent port authority." And further in the River and Harbor Act of 2 March, 1919, appears the following: "It is hereby declared to be the policy

of Congress *that water terminals* are essential to all cities and towns located upon harbors or navigable waterways, and that at least one public terminal should exist, constructed, owned and regulated by the municipality, *or other public agency of the State,* and open to the use of all upon equal terms, and with the view of carrying out the policy to the fullest possible extent, the Secretary of War is hereby vested with the discretion to withhold, unless the public interest would seriously suffer by delay, moneys appropriated in this act for new projects adopted herein, or for the further improvement of existing projects, if, in his opinion, no water terminals exist 'adequate for the traffic, and open to all on equal terms, or unless satisfactory assurances are received that local or other interests will provide such adequate terminal or terminals."

Under the present national progressive administration, $400,000 is to be had from a sale of bonds to the Reconstruction Finance Corporation to build the port terminal at Morehead City. The present act, interpreted according to the setting, its spirit and intent, is in every respect an agency of the State and fulfills the requirements of a public corporation, as laid down by Thompson on Corporations, *supra.* It does not contravene Art. VIII, sec. 1, of the Constitution. Under the Congressional Act above set forth, the port authorities should be composed of "the business men who have an excellent grasp of the export and import business," etc. The present act, Private Laws, 1933 chap. 75, the one under consideration, requires a board "composed of 5 members, all of whom shall be experienced business men," etc., to constitute the Port Commission of Morehead City, N. C., these to be selected by the board of commissioners of Morehead City and be residents of the city. Thompson, *supra,* says: (1) "Thus a public corporation is subject to legislative control without any reference to the consent of the persons who control it." These five members comprising the Port Commission are subject to legislative control without their consent. (2) "A public corporation does not originate in contract, while a private corporation does, and therefore the instrument creating the latter cannot be altered or amended by the law-making power, without the consent of the members who compose it, unless such power is expressly reserved. Public corporations are mere creatures or instrumentalities of the State and are subject to governmental visitation and control. So, the property of a public corporation is not taxable, while that of a private corporation is." The present Port Commission does not originate in contract and its property and bonds issued are exempt from taxation. It has power: "(a) To sue and be sued in the name of the said Port Commission; to acquire by purchase and condemnation, and to hold lands for the purpose of constructing, maintaining or operating the terminal or terminals

hereinafter referred to, and to make such contracts and to hold such personal property as may be necessary for the exercise of the powers of the said Port Commission. (b) To charge and collect reasonable and adequate wharfage fees and other fees, tolls or dues for the use of such city terminal or terminals, or for the service rendered in the operation thereof. (c) To develop the port facilities of Morehead City by acquiring by purchase (construction or otherwise), improving, maintaining and operating a city terminal or terminals for said city, upon the water front of said city, including all necessary wharves, piers, bulkheads, slips, docks, sheds, warehouses, elevators, and railroad and steamship facilities, and also necessary lands, rights in lands and water rights, to be used and operated for the following purposes, namely: for the landing, loading and unloading of vessels, for the loading and unloading of railroad cars or other carriers, for the interchange or transfer of goods, merchandise or other property between vessels, railroad cars or other carriers, and for the temporary shelter or storage of goods, merchandise or property carried or about to be carried by such vessels, railroad cars or other carriers. (d) To issue bonds . . . such bonds and/or notes issued for the purpose or purposes above set out may be sold at private sale, for not less than par, to the Reconstruction Finance Corporation or other governmental agency, with the approval of the board of commissioners of Morehead City, but if such private sale is not so made to said Reconstruction Finance Corporation or other governmental agency, then the sale shall be made under the provisions of the Municipal Finance Act of the State and with the approval of the Local Government Commission. Bonds and notes issued under this act shall be exempt from all State, county or municipal taxes or assessments, direct or indirect, general or special, and the interest paid on said bonds or notes shall not be subject to taxation as income, nor shall said bonds or notes, or coupons of said bonds, be subject to taxation when constituting part of any bank, trust company or other corporation." (3) A public corporation is, generally, political in its nature, and its object is to carry out a scheme of government, while a private corporation has none of these characteristics."   ·

The Port Commission is formed to carry out both the State and the U. S. Government schemes requiring public terminals, and the very language of the present act is to carry out a scheme of government. (4) "Public corporations, as a rule, are not liable either for the negligence or torts of their officers. Perhaps the only exception to this rule is in the case of counties, cities and towns, and then only in a limited sense, and in regard to matters involving the exercise of ministerial acts and not governmental functions."

Like the State Highway Commission, an agency of the State, no one is given the right to sue it in tort and no one given the right to sue the present Port Commission in tort.

(5) "The right to create these corporations is vested in the Legislature, subject only to constitutional limitations." The power over the present port corporation is the Legislature. It is the principal of this agency of the State with plenary power over it.

It cannot be disputed that the Legislature has the right to create the Port Commission and the act "may be altered from time to time or repealed." *Power Co. v. Elizabeth City,* 188 N. C., 278 (287). And to show it is a public agency of the State, absolutely under its control, through the Legislature, the act itself says: Sec. 11. "That it is hereby declared to be the policy of the State of North Carolina to promote, encourage and develop water transportation, service, and facilities in connection with the commerce of the United States, and to foster and preserve in full vigor both rail and water transportation, and that Morehead City, North Carolina, *is hereby declared to be a port to be developed in connection with the interior of the State of North Carolina and other states, and that it is hereby declared and deemed by the State of North Carolina necessary and desirable and in the public interest of the entire State that there shall be established through Morehead City,* through connecting water and rail rates in connection with shipping companies and other transportation companies and in accordance with the provisions of the acts of Congress in the United States and the laws of North Carolina. *The said Port Commission* shall be regarded as performing an essential governmental function in *undertaking the construction, maintenance and operation of the said terminal or terminals and in carrying out the provisions of this act in relation thereto, and shall be required to pay no taxes or assessment upon any of the properties acquired or used by it for such purposes."* (Italics mine.)

If the Great Smoky Mountain National Park (N. C. Park Commission) is an agency of the State in the corner of northwestern North Carolina, so decided by this Court in an unanimous decision, then the act under consideration is a State agency, in the eastern part of North Carolina. In these deflated times, as never before in the history of this nation, is the National Government taking so great an interest in national resources and giving employment in the entire nation and this section. For example: The Great Smoky Mountain National Park development in North Carolina and a connecting road to the Shenandoah National Park in the State of Virginia through North Carolina; the Cape Fear River project, making same navigable from Fayetteville; the Muscle Shoals development and the Norris Dam part of the huge

Tennessee Valley Authority; river improvement and flood control projects in the Mississippi Valley; the inland waterway which goes through Morehead City, and which is now being surveyed to cross Florida by canal, and numerous other projects to build up and give employment to millions of people. The U. S. Government is ready to finance this port development to the extent of $400,000, which would give employment to untold needy and be the entering wedge to develop the other cities and towns on the eastern seaboard of North Carolina, where there is no finer water front anywhere in the nation, and give cheaper freight rates; encourage the fish and oyster industry and water-borne commerce. These eastern ports would soon teem with trade, through water commerce and railroads and hard-surfaced roads. The railroad would reawaken with traffic. This beneficent legislation should not be destroyed "unless the nullity of the act is beyond a reasonable doubt."

The railroads and hard-surfaced State highways now run to a dead end. This progressive legislative enactment tends to unbottle the eastern waters of North Carolina for water-borne commerce and gives new commercial life to the railroads and hard-surfaced State highways.

BROGDEN, J. dissenting: The two primary questions of law are the following:

1. Is the "board to be known as the Port Commission of Morehead City" a municipal corporation within the contemplation of the Constitution and laws of this State?

2. Is chapter 75, Private Laws of 1933, constitutional?

There are certain secondary questions of law presented, but the solution of such questions depends upon the conclusion reached upon the primary questions propounded. The indivisible characteristics of a municipal corporation and the general scope and meaning of the term was described by *Hoke, J.,* in *Southern Assembly v. Palmer,* 166 N. C., 75, 82 S. E., 18. The distinguished jurist wrote: "The term, as used in our Constitution, from the context and its primary significance, evidently refers to municipal corporations proper, as cities and towns, etc., and to those public *quasi-*corporations, such as counties, townships, etc., in which the inhabitants of designated portions of the State's territory are incorporated for the purpose of exercising certain governmental powers for the public benefit. This may be for the benefit of the general public as for the State at large, and also for the public benefit of the particular locality, but it is as a governmental agency and when established as exclusively such, and for that reason, that this exemption is allowed, and it was never intended to embrace a corporation like the present plaintiff, which, however high its aim and purpose, is, in its form and controlling features, a business enterprise, and on which

municipal powers have been incidentally conferred in promotion of the primary purpose.

"This concept of a municipal corporation as embodying the elements, (a) designated territory, (b) the inhabitants within the same, and (c) the existence of governmental powers conferred and to be exercised for the public benefit, both general and local, is recognized in many decisions here and elsewhere and in authoritative textbooks treating of the subject." Copious quotations from the authorities are contained in the opinion. It was suggested in *Commissioners v. Webb,* 160 N. C., 594, 76 S. E., 522, that the power to levy taxes for the purpose of general revenue was one of the tests of the existence of a municipal corporation.

A study of decided cases discloses that, while the term "municipal corporation" originally applied to cities and towns, the significance of the term has been expanded and broadened to keep pace with the necessities and development of modern society. Hence public corporations, created by the State as governmental agencies or for the purpose of exercising specified governmental functions in prescribed portions of the State's territory, are to be regarded as municipal corporations. Thus in *Smith v. School Trustees,* 141 N. C., 143, 53 S. E., 524, it was written: "But in using the term 'municipal corporations' in this connection, these writers do not use the word in its restricted sense of municipal corporations proper, confining it to cities and towns, but in a more enlarged and generally received acceptation, which includes municipal corporations technically so termed, and also public corporations created by the State for the purpose of exercising defined and limited governmental functions in certain designated portions of the State's territory," etc. It is apparent from these definitions, which are supported by practically unanimous authority, that a municipal corporation must either be a city, town, school district or other subdivision of the government, or, at least, a public corporation endowed with governmental powers and acting as a governmental agency.

Manifestly, the Port Commission is not a city, town or governmental subdivision. Hence the question arises: "Is the Port Commission as set up in chapter 75, Private Laws of 1933, a governmental agency?" It is obvious that an agent must have a principal. For whom is the Port Commission an agent? Only two answers can be given to this question. It must either be a governmental agency of Morehead City or of the State of North Carolina. Is it then a governmental agency of Morehead City? Morehead City has no control over it. While the city appoints the commissioners, it cannot remove them or call them to account. It is true that the Port Commission must submit reports to the governing authorities of the city, but nothing can be done about

it after they are submitted. The Port Commission purchases or condemns property according to its own notion, and takes and holds title thereto in its own name, free from the control or supervision of the city. The purchase price of such property is paid from funds owned and controlled by the Port Commission, and if there is a surplus from the operation of the projects, such surplus belongs to the Port Commission, and it can use and dispose of the same according to its own discretion and judgment. Bonds can be issued, not in behalf of Morehead City, but in the name and behalf of the Port Commission, and no liability accrues to the city. If it be conceived that the Port Commission is an agency of Morehead City, then it is obvious that the agent is superior to the principal. Such a result, at least, would constitute a legal freak.

Section 3 of the act authorizes the Port Commission "to develop the port facilities of Morehead City by acquiring, . . . maintaining and operating a city terminal or terminals for said city upon the water front of said city," etc. It is contended that the words "for said city" imply that the Port Commission is performing a municipal or governmental function of Morehead City. Manifestly, if Morehead City had a terminal, it could lease the same to a private enterprise for purposes of operation, and consequently such operation would be done "for said city." Governmental powers are not to be delegated or conferred upon a corporation by bare implication or by building sovereignty upon a phrase of this sort.

If it had been the intention of the General Assembly of North Carolina to create the Port Commission as an integral and indivisible part of the city government of Morehead City, such intention should have been declared in apt and appropriate words.

It would seem, therefore, that the Port Commission was not fashioned by the statute as a part of the governmental function of Morehead City or endowed with any of the governmental power of said city; and hence we come to consider the question as to whether the Port Commission is a governmental agency of the State of North Carolina. At the outset it is to be observed that the State has no control over the Port Commission, either in the selection of its personnel or in the discharge of its functions. The property purchased by the commission will not belong to the State or be acquired in the name of the State. The bonds will not be issued in the name of the State or create any State obligation. It can perform no act binding upon the State. The funds derived from the operation do not belong to the State, nor are they subject to State supervision or control. The salaries to be paid, are not subject to State regulation or inquest. If there is a profit and such is not absorbed in paying salaries, stipends and emoluments to agents and employees, such profit can be thrown into the Atlantic Ocean so far as the State is concerned.

If the Port Commission is a State agency, manifestly it can operate anywhere within the boundaries of the State, because the act prescribes no designated territory for its activities, and creates for it no inhabitants. Hence the Port Commission could use its funds to build terminals and docks in Southport or condemn land for warehouses in Asheville or Micaville.

The theory that the Port Commission is an arm of the State is based upon the idea that the encouragement of water transportation by building terminals and docks at Morehead City will reduce freight rates and aid and facilitate the commercial prosperity of the State. Of course, such a consummation is devoutly to be wished, but the same laudable proposition would be involved in the construction of a railroad or steamship line, and it could not be seriously contended that such enterprises, although exercising governmental power, would constitute municipal corporations within the purview of the Constitution of this State. The fundamental policy of the State inheres in its Constitution, and legislative declarations of policy are persuasive and controlling so long as they are not subject to the superior mandate of the Constitution.

It has been held that Port Commissions, created in various parts of the United States, are municipal corporations, but an examination of the acts creating such Port Commission leaves no doubt not only as to the actual endowment of the corporation with governmental powers but also its actual creation as a governmental agency. See *Rosencranz v. City of Evansville,* 143 N. E., 593; *Paine v. Port of Seattle,* 126 Pac., 628; *Cook v. Port of Portland,* 27 Pac., 263.

A consideration of all the principles of law involved, leads me to the conclusion that the Port Commission, as set up in chapter 75, Private Laws of 1933, is not a municipal corporation.

If the Port Commission is not a municipal corporation and within the boundaries of Article VII of the Constitution of North Carolina, it must be classified under Article VIII, section 1, of said Constitution for the reason that said article undertakes in express words to define and interpret "corporations other than municipal." Section 1 declares: "No corporation shall be created, nor shall its charter be extended, altered or amended by special act," etc. Chapter 75, Public Laws of 1933, is a special act. It is contended, however, that this Court has interpreted Article VIII, section 1, to apply exclusively to private enterprises. This contention is based upon the following decisions: *Mills v. Commissioners,* 175 N. C., 215, 95 S. E., 481; *Dickson v. Brewer,* 180 N. C., 403, 104 S. E., 887, and *Watts v. Turnpike Co.,* 181 N. C., 129, 106 S. E., 497. It is to be noted that the *Mills case* and the *Dickson case* involved the exercise of power by a school district and two counties.

School districts and counties have always been held to be municipal corporations. The *Watts case* involved a business enterprise and in discussing the rights of parties with reference to Article VIII, section 1, of the Constitution, the Court said: "The inhibitory features and effect of these amendments do not apply or extend to municipal or *quasi*-public corporations, such as counties, cities, towns and other recognized governmental agencies," etc. In the *Dickson case, supra,* referring to Article VIII, section 1, of the Constitution, the Court said that this clause of the Constitution "would seem clearly to have reference to private or business corporations and does not refer to public or *quasi*-public corporations acting as governmental agencies." In other words, all corporations within the purview of Article VII of the Constitution, and all corporations acting as governmental agencies are outside the inhibition of Article VIII, section 1. Conversely all corporations, public or private, which are not created as governmental agencies, fall within the inhibition of Article VIII, section 1, of the Constitution.

The opinion of the Court does not interpret the Port Commission as a municipal corporation, within Article VII of the Constitution, and moreover, declares that it is not a corporation other than municipal within Article VIII. Consequently it is neither fish nor fowl. It is apparently some sort of a new creature defying constitutional classification that can wander at will in and about the State, incurring no liability, and subject to no control, regulation or supervision. It owns neither a grain of sand nor drop of water as a basis of credit, and its only asset is the promise of a loan of money.

Undoubtedly, the Legislature had the power to fashion the Port Commission as a piece of governmental machinery and supply it with all the necessary running parts essential to the discharge of contemplated function. It had the power to create a State agency, subject to the supervision and control of the sovereign as in the *Park case,* 196 N. C., 284, or as a municipal agency as in the *Brockenbrough case,* 134 N. C., 1, without invading or offending Article VII or Article VIII of the Constitution. But it chose to do neither. Instead, it set up a skeleton without a drop of governmental blood or a breath of governmental life, and the Court is called upon to work a miracle and clothe it with nerve and sinew and make it a living soul.

The sole question of law in this case is the construction of a statute as written. The Court is not charged with the duty of giving a transfusion of constitutional blood. The language is plain. Judicial legislation in the guise of interpretation of a statute is not within the constitutional function of the Court.

The underlying reasons for the creation of the Port Commission and the anticipated result from such creation are wide reaching, but the problem for us to determine is whether or not the act as written actually constitutes the Port Commission as a governmental agency. My conclusion is that it does not and that the act ought to fail.

I am authorized to say that *Stacy, C. J.,* concurs in this dissent.